

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TODD FENER, Derivatively on Behalf of ARTHUR J. GALLAGHER & CO., | ) ) | Case No. |
| | ) | |
| Plaintiff, | ) ) | **JUDGE** JOHN W DARRAH |
| | ) | |
| vs. | ) ) | 04C 8093 |
| ROBERT E. GALLAGHER, J. PATRICK GALLAGHER, JR., BERNARD L. HENGESBAUGH, ELBERT O. HAND, ILENE S. GORDON, GARY P. COUGHLAN, T. KIMBALL BROOKER, JAMES R. WIMMER and DAVID S. JOHNSON, | ) ) ) ) ) ) ) | MAGISTRATE JUDGE ASHMAN |
| | ) | |
| Defendants, | ) ) | |
| | ) | |
| – and – | ) ) | |
| | ) | |
| ARTHUR J. GALLAGHER & CO., a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION AND SUMMARY OF ACTION

1.     This is a shareholder derivative action brought by a shareholder of Arthur J.

Gallagher & Co. ("Gallagher" or the "Company"), on behalf of the Company against its entire Board

of Directors and certain top officers seeking to remedy defendants' violations of state law, including

breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and

unjust enrichment, that occurred between July 22, 2003 and the present (the "Relevant Period") and

that have caused substantial losses to Gallagher and other damages, such as to its reputation and

goodwill, arising out of defendants having caused Gallagher to engage in fraudulent insurance

placement practices and to violate the federal securities laws by disseminating false and misleading

statements concerning the Company's financial results and operations.

2.     Gallagher is engaged in providing insurance brokerage, risk management and related

services to clients in the United States and abroad.  Its principal activity is insurance brokerage,

including the negotiation and placement of insurance for its clients.  Gallagher also specializes in

furnishing risk management services.  Risk management purportedly involves assisting clients in

analyzing risks and determining whether proper protection is best obtained through the purchase of

insurance or through retention of all or a portion of those risks and the adoption of corporate risk

management policies and cost-effective loss control and prevention programs.  The Company

operates through a network of more than 250 sales and service offices located throughout the United

States and eight countries abroad and through a network of correspondent brokers and consultants in

more than 100 countries worldwide.

3.     Gallagher is the nation's fourth largest insurance broker.

4.     On October 14, 2004, New York Attorney General Eliot Spitzer sued the nation's

leading insurance brokerage firm, Marsh & McLennan Cos. ("Marsh & McLennan") alleging that

Marsh & McLennan steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts.

5.     "The insurance industry needs to take a long, hard look at itself," Spitzer said. "If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform.   There is simply no responsible argument for a system that rigs bids, stifles competition and cheats consumers," he added.

6.     Spitzer was joined at a news conference announcing the actions by New York State Insurance Superintendent Gregory V. Serio, who said: "This has gone from an inquiry into failure to disclose compensation to an active investigation of bid rigging and improper steering. This certainly proves to be the adage that where there is smoke, there is fire."

7.     Spitzer's investigation has thus far resulted in a civil action being filed by the State of New York against Marsh & McLennan and the arrest of two American International Group Inc. ("AIG") (the nation's largest insurer) executives in a fraud probe Spitzer said touches "virtually every line of insurance." Pursuant to so-called "contingent commitment" agreements, insurers such as AIG pay fees to brokers such as Gallagher and Marsh & McLennan based on the amount and profitability of business that these brokers steer to them.   However, the payment of these fees is concealed from the insurance customers who believe that their brokers are instead selecting insurance based on the customer's best interests.  Spitzer says these brokers have an unacceptable conflict of interest if they accept payments from insurers, because those fees could adversely prejudice the choice of where to place a client's business.

8.     Gallagher's contingent commission revenues received in fiscal 2003 from insurance companies were $33 million, equaling approximately 2% of the Company's gross revenues.  For the nine months ending September 30, 2004, Gallagher's contingent commission revenues received were

$31.7 million. In addition to subjecting Gallagher to millions of dollars in potential criminal and/or civil liability for its complicity in this scheme, and greatly damaging the Company's goodwill and reputation, by accepting these dubious payments in order to increase reported revenues and earnings during the Relevant Period, and then reporting the revenues procured by the payments without disclosing that Gallagher's insurance customers may have been unwittingly conned into overpaying for insurance, defendants caused Gallagher to overstate its revenues and to disseminate materially false and misleading statements concerning the Company's results and operations in violation of the federal securities laws, including the Sarbanes-Oxley Act of 2002. Via Sarbanes-Oxley, which became effective in July 2002, the U.S. Congress mandated that companies that are subject to SEC regulation take enhanced action to increase and then maintain the increased effectiveness of their internal disclosure, financial and accounting controls to prevent misstated financial information and other fraudulent conduct. These requirements are unique in all the world and were intended to improve corporate governance to decrease the possibility of directorial or management misconduct, thus increasing management accountability and safeguarding corporate assets and shareholder value.

9. Defendants' misconduct has subjected the Company to millions of dollars in potential civil and criminal liability. On October 26, 2004, defendants announced that Gallagher had received a subpoena from the Connecticut Attorney General concerning allegations of bid-rigging and violations of the state's antitrust laws. The subpoena asks Gallagher to identify: (a) every agreement involving "contingent commissions" -- extra commissions often based on volume and sometimes profitability of a broker's business with an insurer, (b) the names of all employees, officers and agents involved in providing price quotes to a person or firm that has such a commission agreement, and (c) each instance in which a broker provided an insurer with information on a competitor's price proposal. The subpoena also asks that Gallagher turn over any documents it provided to Spitzer's

investigation. In addition to price-fixing and bid-rigging, the Connecticut subpoena is looking for evidence of "allocating or dividing customers or territories for insurance."

10. In connection with the announcement of the Connecticut Attorney General's subpoena, defendants announced that effective January 1, 2005, the Company would eliminate its so-called "contingent commission" arrangements. But this purported corrective action amounted to little more than a promise to close the barn door long after the horse had bolted and does nothing to rectify the damage already done to Gallagher's reputation and standing in the business community. The loss of contingency commissions is expected to reduce Gallagher's earnings by 13% on a going forward basis.

11. On October 27, 2004, Merrill Lynch issued a research report indicating that it would reduce its earnings expectations for Gallagher for 2004 to $2.08 per share from $2.17 per share and that it was reducing its 2005 earnings expectations from $2.45 per share to $2.30 per share to reflect lower margins. Additionally, Merrill Lynch stated that to "[f]urther account for the elimination of contingent commissions, we are setting our 2005 estimate at $2.10 per share."

12. On December 2, 2004, Gallagher's third-party administrator, Gallagher Bassett Services, Inc., was served with a subpoena from Eliot Spitzer looking at whether Gallagher accepted financial incentives to refer business to its third-party administrator and whether those fees were disclosed to its insurance customers. In addition to Spitzer's inquiry, which he has publicly said is still likely to yield additional suits against other companies and possibly even additional criminal charges, probes of compensation practices in the industry have been launched by California Insurance Commissioner John Garamendi, Connecticut Attorney General Richard Blumenthal, the Minnesota Department of Commerce, the Massachusetts Department of Consumer Affairs and the National Association of Insurance Commissioners. In fact, the compensation arrangements designed by the Gallagher Board explicitly encourage the misuse of contingent commissions and bid-rigging

- 4 -

by incentivizing Gallagher's management to increase brokerage revenues at all costs to increase their own bonuses:

### Management Bonus Plan for the Brokerage Services Division

All management employees of the Brokerage Services Division are eligible to participate in the Management Bonus Plan. The bonuses under this plan are determined by a formula applied to the pretax profitability of the Brokerage Services Division.

13. Throughout the Relevant Period, the Individual Defendants breached their duties of loyalty, due care and good faith by allowing other defendants to cause or by themselves causing the Company to defraud or assist in defrauding insurance brokerage clients and to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of two formal investigations by the New York and Connecticut State Attorneys General offices and may face civil or criminal prosecution. As a result, Gallagher has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b) Costs incurred in investigating and defending Gallagher and certain officers in the New York and Connecticut Attorneys General investigations, plus potentially millions of dollars in settlements or to satisfy any adverse judgments;

(c) Costs incurred defending the Company for any charges of violating applicable laws; and

(d) Any costs or expenses associated with payment of any fines, penalties or judgments arising out of defendants' misconduct.

- 5 -

14.     These actions have also irreparably damaged Gallagher's corporate image and goodwill. For at least the foreseeable future, Gallagher will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Gallagher's ability to raise equity capital or debt on favorable terms in the future will be impaired.

15.     Because the directors and officers of this public company were personally involved in or were aware of the alleged wrongdoing and illegal violations, demand on them to take appropriate legal action to protect the Company and its shareholder community is futile. The directors will never sue themselves. And, were they to do so, such a lawsuit would trigger the insured vs. insured exclusion in the directors' and officers' liability insurance policies covering them as Gallagher officers and directors, exposing them to millions of dollars of uninsured personal liability. Under such circumstances, any request or demand on the directors of the Company to institute this legal action would be futile and is thus excused, so that this derivative action brought by shareholders may proceed.

16.     Thus, the named plaintiff has sued the directors and certain officers of the Company for their illegal conduct in connection with this disaster. This suit – pursued derivatively – seeks to obtain legal and equitable relief in the form of monetary damages, injunctive relief, and corporate governance changes to not only compensate for this apparent wrongdoing, but also to protect this public company and its shareholder community from a recurrence of such defalcations in the future.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2). Complete diversity exists between each defendant and the plaintiff. The amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more defendants either resides in or maintains executive offices in this district, many of the acts and transactions complained of herein occurred in this district and defendants conduct business in this district.

## PARTIES

19. Plaintiff Todd Fener is, and was at times relevant hereto, an owner and holder of Gallagher common stock. Plaintiff is a resident and citizen of Florida.

20. Nominal defendant Gallagher is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at Two Pierce Place, Itasca, Illinois.

21. Defendant Robert E. Gallagher ("Robert Gallagher") is, and at all times relevant hereto was, Chairman of the Board of Directors (the "Board") and a director of Gallagher. Robert Gallagher has served as a director since 1950; as Chairman since 1990; and previously served as Chief Executive Officer ("CEO") from 1963 to 1994. Robert Gallagher is an uncle of J. Patrick Gallagher, Jr., the Company's current CEO and President. Because of Robert Gallagher's positions, he knew the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Robert Gallagher participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Pursuant to a supplemental deferred compensation arrangement, since July 1, 1996, Robert Gallagher has received a retirement payment of $100,000 annually. Defendants concede in the

Company's 2004 Annual Proxy Statement that Robert Gallagher is an executive of Gallagher. Defendant Robert Gallagher is a citizen of Illinois and may be served at 1000 Sunset Road, Winnetka, Illinois.

22.     Defendant J. Patrick Gallagher, Jr. ("Patrick Gallagher") is, and at times relevant hereto was, President, CEO and a director of Gallagher. Patrick Gallagher has served as a director since 1986; as CEO since 1995; as President since 1990; and previously served as Chief Operating Officer from 1990 to 1994 and as Vice President-Operations from 1985 to 1990. Patrick Gallagher is the nephew of Chairman Robert Gallagher. Because of Patrick Gallagher's positions, he knew the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Patrick Gallagher participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, FY:02, and FY:01, Gallagher paid defendant Patrick Gallagher $2.281 million, $2.12 million, and $2.34 million, respectively, in salary, bonus and other compensation, and granted him 50,000, 25,000, and 25,000 options to purchase Gallagher stock, with an estimated value at grant of $1.984 million, $904,000 and $1.056 million, respectively. Defendant Patrick Gallagher is a citizen of Illinois and may be served at 1248 Elm Court, Glenview, Illinois.

23.     Defendant David S. Johnson ("Johnson") is, and has been since 2003, a director of Gallagher. Johnson has served as president of North American Commercial for Kraft Foods, Inc., since 2003; as president of North American Operations, Technology, Procurement, Information

- 8 -

Systems and Sales for Kraft Foods North America, Inc., 2002 to 2003; as group vice president of Kraft Foods North America, Inc., 2000 to 2002; and as executive vice president of Kraft Foods, Inc., 1998 to 2000. Because of Johnson's positions and experience as an executive of a significant U.S. corporation, he knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Johnson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Johnson is a citizen of Illinois and may be served at 888 Woodstream Court, Lake Forest, Illinois 60045.

24. Defendant Bernard L. Hengesbaugh ("Hengesbaugh") is, and at all times relevant hereto was, a director of Gallagher and has been since 2004. Hengesbaugh has served as Chairman of the Board of CNA Financial Corporation ("CNA"), an insurer of commercial enterprises, since 2002, and prior to that served as chairman and CEO of CNA Insurance Companies from 1999 to 2002, and in various executive capacities with CNA since 1990. The Company and certain of its subsidiaries engage in brokerage and other transactions on behalf of CNA Financial and certain of its subsidiaries and the Company will continue to engage in such transactions with CNA Financial. Because of Hengesbaugh's positions and considerable experience as a CEO in the insurance industry, he knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate

- 9 -

officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Moreover, because of Hengesbaugh's dual fiduciary capacities at Gallagher and CNA, and the importance of Gallagher's ongoing business to CNA, Hengesbaugh is financially beholden to the Gallaghers and Gallagher's management. During the Relevant Period, Hengesbaugh participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Hengesbaugh is a citizen of Illinois and may be served at 202 Thompson Drive, Wheaton, Illinois.

25. Defendant Elbert O. Hand ("Hand") is, and has been since 2002, a director of Gallagher. Hand currently serves as the Chairman of the Board of Hartmarx Corporation, a consumer apparel products business, and previously served as Hartmarx's CEO from 1992 to April 2002, and as president and chief operating officer from 1985 to 1992. Because of Hand's positions both as a director of Gallagher and as a long-time CEO of a major corporation, he knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hand participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Hand is a citizen of Illinois and may be served at 520 West Huron Street, Unit 510, Chicago, Illinois.

26. Defendant Ilene S. Gordon ("Gordon") was, at times relevant hereto, a director of Gallagher. Gordon has served as president of Food Packaging, Americas, Alcan Inc. since 2004

(successor of Pechiney Plastic Packaging, Inc.); as president of Pechiney Plastic Packaging, Inc., and senior vice president of Pechiney Group since 1999 to 2004; as vice president and general manager of Tenneco Packaging Folding Carton Business from 1997 to 1999; and as vice president-operations of Tenneco, Inc. from 1994 to 1997. Because of Gordon's positions and extensive experience as an executive of substantial U.S. corporations, she knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Gordon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Gordon is a citizen of Massachusetts and may be served at 250 Hammond Pond Parkway #1213S, Newton, Massachusetts.

27. Defendant Gary P. Coughlan ("Coughlan") was, at times relevant hereto, a director of Gallagher. Coughlan served as a senior vice president and chief financial officer of Abbott Laboratories from 1990 to March 2001. Prior to that, Coughlan served as senior vice president of Kraft General Foods from 1989 to 1990 and as senior vice president and chief financial officer of Kraft, Inc. which he joined in 1972, where he served with defendant Johnson. Because of Coughlan's senior executive positions with a heavy emphasis on financial oversight, both with Abbott and Kraft, and his directorship at Gallagher, he knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and

- 11 -

connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Coughlan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Coughlan is a citizen of Illinois and may be served at 1135 Central, Glenview, Illinois.

28.     Defendant T. Kimball Brooker ("Brooker") was, at times relevant hereto, a director of Gallagher. Brooker has served as president of Barbara Oil Company, an oil and gas exploration and investment business, since 1989 and as a managing director of Morgan Stanley & Co., Inc. from 1975 to 1988. Because of Brooker's senior executive and financial positions, he knew and understood the adverse non-public information about the business of Gallagher, including how the contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Brooker participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Brooker is a citizen of Illinois and may be served at 1500 North Lake Shore Drive, Apartment 16A, Chicago, Illinois.

29.     Defendant James R. Wimmer ("Wimmer") was, at times relevant hereto, a director of Gallagher. Wimmer, a lawyer, served as a partner of Lord, Bissell & Brook from 1959 to 1992 and was Of Counsel from 1992 to 1999, representing companies and individuals in securities and insurance related matters. Because of Wimmer's positions and knowledge of the law, he knew and understood the adverse non-public information about the business of Gallagher, including how the

contingent commission agreements operated and the additional revenue they provided, and Gallagher's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Wimmer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Wimmer is a citizen of Illinois and may be served at 344 South La Grange Road, La Grange, Illinois.

30.     Each of the defendants identified in ¶¶21-29 are referred to herein as the "Director Defendants" and/or the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors and/or fiduciaries of Gallagher and because of their ability to control the business and corporate affairs of Gallagher, the Individual Defendants owed Gallagher and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Gallagher in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Gallagher and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each director and officer of the Company owes to Gallagher and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Gallagher, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Gallagher, each of the Individual Defendants had access to adverse non-public information about Gallagher's financial condition and operations, and the improper representations alleged herein.

34.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Gallagher, and was at all times acting within the course and scope of such agency.

35.    To discharge their duties, the officers and directors of Gallagher were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Gallagher were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

- 14 -

Company's financial results and prospects, and ensuring that the Company maintain an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Gallagher conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Gallagher, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Gallagher's Board during the Relevant Period.

37.     Throughout the Relevant Period, the Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal

actions and course of conduct during the Relevant Period, the Company is now the subject of a formal investigation by the New York and Connecticut State Attorneys General offices. As a result, Gallagher has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     Costs incurred in investigating and defending Gallagher and certain officers in the New York and Connecticut Attorneys General investigations, plus potentially millions of dollars in settlements or to satisfy any adverse judgments; and

(c)     Defending the Company for any charges of violating applicable law.

38.     Moreover, these actions have irreparably damaged Gallagher's corporate image and goodwill. For at least the foreseeable future, Gallagher will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Gallagher's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FACTUAL ALLEGATIONS

39.     Gallagher is a publicly traded company with approximately 7,200 employees and over $1.264 billion in annual revenues. Gallagher is the nation's fourth largest insurance broker by market value.

40.     There are basically three types of entities in the insurance market. First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves. Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, present the quotes to the client, and make

recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment. Third, there are insurance companies. They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

41.    In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission it is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients, particularly large commercial clients, break out the broker's fee and pay it directly to the broker.

42.    In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called "contingent commissions" and come from insurance companies pursuant to arrangements generally known as "contingent commission agreements." The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

43.    Gallagher's contingent commissions in 2003 were approximately $33 million, which represents 2% of gross revenues, and $31.7 million for the nine months ending September 30, 2004. Unbeknownst to Gallagher's clients, through these contingent commission agreements defendants caused Gallagher to agree to steer business to complicit and profiting insurance companies by, among other things, assisting in rigging of bids and the fixing of prices.

- 17 -

## IMPROPER STATEMENTS

44.     On July 22, 2003, defendants caused the Company to issue a press release entitled

"Arthur J. Gallagher & Co. Announces Second Quarter 2003 Financial Results." The press release

stated in part:

> Arthur J. Gallagher & Co. today reported its financial results for the three- and six-month periods ended June 30, 2003.
>
> *          *          *
>
> Brokerage Segment Highlights - Second Quarter 2003
>
> - Record second quarter net earnings per share - up 41% over second quarter 2002.
>
> - 32% increase in pretax net income.
>
> - Improved compensation ratio - down to 55% from 58% in first quarter 2003.
>
> - The company's 2001 and 2002 organic hiring strategy is delivering better-than-expected results.
>
> - Solid 17% revenue growth, of which 14% is organic.
>
> Risk Management Segment Highlights - Second Quarter 2003
>
> - Outstanding second quarter revenue growth of 16% - all organic.
>
> - Claim counts have returned to pre-9/11 levels.
>
> - Continued customer retention levels in excess of 98%.
>
> Financial Services Segment Highlights - Second Quarter 2003.
>
> - New synthetic fuel project up and running.
>
> - Prior year second quarter included net non-recurring investment gains of $9.3 million after tax, or $0.10 per share.
>
> ***"We are extremely pleased with the pretax margin improvements seen in our Brokerage segment during the second quarter — up 2% over second quarter 2002 and up 4% over first quarter 2003," said President and Chief Executive Officer, J. Patrick Gallagher, Jr. "These margin improvements contributed to our Brokerage segment's 32% growth in pretax earnings in the second quarter and 19% growth in the six months ended June 30, 2003. Our entire production force, including new hires and merger partners, are all performing well. Our clients are***

*pleased that our niche strategy and alternative market expertise continue to provide them with great value during this challenging pricing environment.*"

"Our Risk Management segment continues to improve its growth rate. Claim counts have returned to pre-9/11 levels largely due to strong new business production, and client retention levels continue to exceed 98%," added Mr. Gallagher.

45.     On October 21, 2003, defendants caused the Company to issue a press release entitled

"Arthur J. Gallagher & Co. Announces Record Third Quarter 2003 Financial Results." The press

release stated in part:

Arthur J. Gallagher & Co. today reported its financial results for the three- and nine-month periods ended September 30, 2003.

\*       \*       \*

Brokerage Segment Highlights - Third Quarter 2003

- Record third quarter net earnings per share - up 25% over prior year.

- Pretax margin up to 24%.

- Improved compensation ratio.

- 2001 and 2002 organic hiring strategy delivering better-than-expected results.

- Solid 12% revenue growth for the quarter, of which 9% is organic. And 16% growth YTD, of which 12% is organic.

Risk Management Segment Highlights -- Third Quarter 2003.

- Third quarter pretax earnings up 74% over prior year and up 22% YTD.

- Claim counts continue to grow - now exceeding pre 9/11 levels.

- Pretax margin of 14% - up 5% over third quarter 2002.

- Excellent 16% revenue growth in the quarter and 14% YTD - all of which is organic.

Financial Services Segment Highlights – Third Quarter 2003

- We continue to reduce our investment holdings.

- Synthetic fuel production for the quarter was ahead of prior quarters, resulting in a 24% effective tax rate versus 30% in 2002.

- 19 -

- Prior year third quarter included non-recurring net investment losses of $20.2 million after tax, or $0.22 per diluted share.

- Adoption of FIN 46 – In the third quarter of 2003, the company early adopted a new accounting pronouncement, FASB Interpretation No. 46 (FIN 46) – "Consolidation of Variable Interest Entities," which required the company to consolidate one partially-owned investment partnership not previously consolidated because it is not controlled by the company through a majority voting interest. The adoption of FIN 46 did not result in any additional debt on the company's balance sheet nor did it have any impact on its consolidated net earnings or stockholders' equity. The effect of consolidating this one investment partnership on the company's consolidated statement of earnings and balance sheet is shown on pages 3 and 6, respectively, of this earnings release.

*"We are extremely pleased with the quarter-to-quarter improvement in our Brokerage segment's pretax margin – up 6% over second quarter 2003 and up 10% over first quarter 2003," said President and Chief Executive Officer, J. Patrick Gallagher, Jr. "A solid quarter of 12% revenue growth on top of third quarter 2002's growth of 36% is an outstanding achievement by our Brokerage operations. In the first 9 months of 2003, we grew revenues by 16% over the same period in 2002. When compared to the first 9 months of 2001, our Brokerage revenues have grown $205.2 million, or 50%. Organic growth continues to be strong at 9% for the quarter and 12% for the first 9 months of 2003. We applaud the success of our employees, especially the new hires who have contributed greatly to this growth."*

"Our Risk Management segment has improved its growth rate and margins despite the post-9/11 economic slow-down. This confirms Gallagher Bassett's continued recognition as the best and most stable claims management services provider in the business. Gallagher Bassett's clients receive great value from our efficient operating platform and from the service provided by its rock-solid adjustors and seasoned management team," added Mr. Gallagher.

*"AJG is stronger than ever," said Mr. Gallagher. "We have a solid balance sheet with over $400 million in tangible net worth. And, we distribute a significant portion of our earnings back to our shareholders every year. Since our IPO, we've increased our cash dividend, on average, 19% per year, and so far this year we've used $51 million to repurchase 1.9 million of our shares."*

46. On November 20, 2003, defendants caused the Company to issue a press release entitled "Arthur J. Gallagher & Co. Announces Regular Fourth Quarter Dividend." The press release stated in part:

Arthur J. Gallagher & Co. today declared a regular quarterly cash dividend of eighteen cents ($.18) per share on the Common Stock of the Company, payable on January 15, 2004 to Shareholders of Record as of December 31, 2003.

- 20 -

47.    On January 22, 2004, defendants caused the Company to issue a press release entitled "Arthur J. Gallagher & Co. Increases Quarterly Cash Dividend 39% to $.25 Per Share." The press release stated in part:

Arthur J. Gallagher & Co. today announced that its Board of Directors declared a quarterly cash dividend on the company's common stock of $.25 per share payable on April 15, 2004 to shareholders of record as of March 31, 2004.

*"We are extremely pleased to announce this 39% increase in our dividend over the prior quarter's dividend of $.18 per share. This increase rewards our shareholders yet leaves Gallagher with ample cash to fund our internal growth, make acquisitions in our core brokerage and risk management businesses and maintain our stock repurchase program," said J. Patrick Gallagher, Jr., President and CEO. "We have provided our shareholders with dividend increases that average 20% annually over the last 21 years while still maintaining a solid balance sheet. We remain committed to rewarding Gallagher shareholders with both growth and returns."*

48.    On January 27, 2004, defendants caused the Company to issue a press release entitled "Arthur J. Gallagher & Co. Announces Record Fourth Quarter and Full Year 2003 Financial Results." The press release stated in part:

Arthur J. Gallagher & Co. today reported its financial results for the fourth quarter and full year 2003.

\*        \*        \*

Brokerage Segment Highlights – 2003

- Record full year and fourth quarter net earnings per share - up 24% and 19%, respectively, over prior year.

- Solid 15% revenue growth for the year, of which 10% is organic, and 10% growth in fourth quarter, of which 6% is organic.

- Pretax margin at 19% and 21% for the full year and fourth quarter, respectively.

- Improved fourth quarter compensation ratio to 52% despite margin drag of 1% related to expensing stock-based compensation (see below) and the adverse impact of foreign currency translation.

Risk Management Segment Highlights – 2003

- Record full year and fourth quarter net earnings per share - up 46% and 125%, respectively, over prior year.

- Excellent revenue growth of 14% and 16% for the year and fourth quarter, respectively, all of which is organic.

- Increasing claim counts reflect excellent new business sales and recovering economic conditions.

- Pretax margin of 13% for the year and fourth quarter - up 2% and 6% respectively, over prior year.

- Client retention remains strong and client use of Gallagher's proprietary Risx-Facs system now exceeds 11 million page views per month.

Financial Services Segment Highlights – 2003

- Synthetic fuel production for the year and fourth quarter was ahead of prior periods, resulting in a 24% effective tax rate in 2003 versus 30% in 2002.

- Gallagher has an interest in a synthetic coal partnership that is under examination by the IRS for the year 2000. The IRS has advised Gallagher that their examination will be closed without any changes being proposed. Gallagher continues to believe that all of its synthetic coal partnerships have properly claimed tax credits.

- Significant reduction in investment holdings net of related borrowings – down to $205.2 million at December 31, 2003 versus $297.7 million at December 31, 2002.

- Substantial reduction in off-balance-sheet investment related letters of credit, financial guarantees and commitments - down to $35.1 million at December 31, 2003 from $64.6 million at December 31, 2002.

- Full year results include net after tax investment losses of $18.5 million, or $0.20 per diluted share, in 2003 and $15.4 million net after tax, or $0.17 per diluted share, in 2002.

- Adoption of FIN 46 – In the third quarter of 2003, Gallagher early adopted a new accounting pronouncement, FASB Interpretation No. 46 (FIN 46) – "Consolidation of Variable Interest Entities," which required the company to consolidate one investment not previously consolidated because the company does not control the investment through a majority voting interest. The adoption of FIN 46 did not result in any additional debt on the company's balance sheet nor did it have any impact on its consolidated net earnings or stockholders' equity.

Adoption of New Accounting For Stock-Based Compensation – In the fourth quarter of 2003, the company early adopted the fair value method of accounting for employee stock options and its employee stock purchase plan pursuant to Statement of Financial Accounting Standards No. 123. This change in accounting method is being applied prospectively to all awards granted since January 1, 2003 resulting in a fourth quarter charge of $1.4 million after tax, or $0.02 per diluted share, in the fourth quarter 2003. The impact on prior 2003 quarters was not material.

*"Given the current insurance rate environment, we are extremely pleased with our Brokerage segment's growth of 10% in the fourth quarter and 15% for the full year 2003. Brokerage revenues are up 47% since 2001 — a great testament to Gallagher's sales culture," said President and Chief Executive Officer, J. Patrick Gallagher, Jr.*

"Our Risk Management segment finished off a spectacular year by posting 16% revenue growth in the fourth quarter and 14% for the full year 2003. Margins continue to improve and our client retention rates remain strong. Gallagher Bassett continues its 40 year history of being the best and most stable claims management services provider in the business.

*"Together, our Brokerage and Risk Management segments' revenue grew 12% in the fourth quarter, of which 9% is organic, and 15% for the year, of which 11% is organic. Pretax income for these two combined segments grew 22% in the fourth quarter 2003 and 19% for the full year 2003. Since 2001, pretax income for these two segments is up 45%.*

*"The Gallagher team accomplished a great number of positive initiatives during 2003. We validated our hiring strategy, returned $142.7 million in cash to our stockholders – $61.9 million in dividends and $80.8 million by repurchasing 2.9 million of our shares, increased our first quarter 2004 dividend 39% (announced on January 22, 2004), substantially exited our venture capital investments, significantly reduced our concentrations in other investment categories, improved the transparency of our financial reporting, reconstituted our Board of Directors to comprise a majority of independents (announced January 23, 2004), paid off all of our corporate related debt, executed an increased three-year $250 million line of credit, closed 14 acquisitions, and kept our tangible net worth at nearly $400 million," said Gallagher.*

49.     On April 27, 2004, defendants caused the Company to issue a press release entitled "Arthur J. Gallagher & Co. Announces Record First Quarter 2004 Financial Results." The press release stated in part:

Arthur J. Gallagher & Co. today reported its financial results for the quarter ended March 31, 2004.

*         *         *

- Synthetic fuel production for the quarter was ahead of prior year, resulting in a 20% effective tax rate for the company in 2004 versus 25% for the first quarter of 2003.

- First quarter 2003 included an after-tax charge of $19.3 million, or $0.21 per share, relating to the exit from investments in venture capital, development stage enterprises and turn-arounds.

- Adoption of FIN 46 – In the third quarter of 2003, Gallagher adopted a new accounting pronouncement, FASB Interpretation No. 46 (FIN 46) – "Consolidation of Variable Interest Entities," which required the company to consolidate one investment not previously consolidated because the company does not control the investment through a majority voting interest. Previously reported financial statements were not restated for the adoption of FIN 46.

*"This was a great quarter for Gallagher in spite of rate moderation in the insurance marketplace," said J. Patrick Gallagher, Jr., President and Chief Executive Officer. "Individually, our Brokerage and Risk Management segments each posted record first quarter earnings. On a combined basis, these segments grew revenues 11%, of which 7% was organic, improved pretax margins 1.6%, and increased pretax earnings 23% and net earnings 31%.*

*"The Gallagher culture is alive and well and our team is doing an excellent job. Every day, our professionals are working hard, delivering great value to our customers and growing shareholder value."*

50.    On May 18, 2004, defendants caused the Company to issue a press release entitled

"Arthur J. Gallagher & Co. Announces Regular Second Quarter Dividend." The press release stated

in part:

Arthur J. Gallagher & Co. today declared a regular quarterly cash dividend of twenty five cents (\$.25) per share on the Common Stock of the Company, payable on July 15, 2004 to Shareholders of Record as of June 30, 2004.

51.    On July 22, 2004, defendants caused the Company to issue a press release entitled

"Arthur J. Gallagher & Co. Announces Regular Third Quarter Dividend and Continuation of Its

Stock Repurchase Plan." The press release stated in part:

Arthur J. Gallagher & Co. today declared a regular quarterly cash dividend and announced the continuation of its stock repurchase plan.

Gallagher's Board declared a regular quarterly cash dividend of twenty five cents (\$.25) per share on the Common Stock of the Company, payable on October 15, 2004 to Shareholders of Record as of September 30, 2004.

Gallagher also announced the continuation of its stock repurchase plan, originally adopted on May 10, 1988, which authorizes the repurchase of 5,000,000 shares at such times and prices as the company may deem advantageous and in compliance with the SEC's Rule 10b-18. Douglas K. Howell, Chief Financial Officer, noted, however, that there was no commitment or obligation on the part of the company to purchase any particular amount of common stock and that the plan

could be suspended at any time at the company's discretion. On June 30, 2004, the company had 91.9 million shares of its common stock outstanding.

52. On July 27, 2004, defendants caused the Company to issue a press release entitled "Arthur J. Gallagher & Co. Announces Record Second Quarter 2004 Financial Results." The press release stated in part:

> Arthur J. Gallagher & Co. today reported its financial results for the quarter and six-month period ended June 30, 2004.
>
> *     *     *
>
> "This was another strong quarter for Gallagher despite softening rates in the insurance marketplace. Our Brokerage and Risk Management segments each posted record second quarter earnings," said J. Patrick Gallagher, Jr., President and Chief Executive Officer. "On a combined basis our Brokerage and Risk Management segments posted excellent results for the second quarter:
>
> - 26% growth in earnings per share,
>
> - 13% growth in revenues, of which 8% is organic,
>
> - 20% growth in pretax earnings, and
>
> - 18% pretax margin, a 1.1 point improvement over second quarter 2003, despite margin drag of 0.4% related to expensing stock-based compensation and 0.3% related to foreign currency translation.
>
> "These results demonstrate that Gallagher's core businesses are performing well in the changing marketplace. Every day our professionals are out there working together to deliver the best value for our customers while continuing to grow value for our shareholders."
>
> Brokerage Segment Second Quarter Highlights - Record Earnings
>
> - 19% growth in earnings per share.
>
> - 11% growth in revenues, of which 4% is organic.
>
> - 14% growth in pretax earnings.
>
> - 19% pretax margin, a 1 point improvement over second quarter 2003, despite margin drag of 0.5% related to expensing stock-based compensation and 0.4% related to foreign currency translation.
>
> - Acquisition pipeline remains strong.

- 25 -

53.     During the Relevant Period defendants caused the Company to disseminate these materially false and misleading statements regarding the Company's results and operations. The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     that they were causing the Company to accept dubious "contingent commissions" pursuant to "contingent commission agreements" which pitted the Company's own interests against those of its brokerage clients;

(b)     that by concealing the true importance of these "contingent commissions" and "contingent commission agreements," the defendants caused Gallagher to violate applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c)     that as a result of (a)-(b) above, as more fully described in ¶¶54-58, the Company's previously reported revenue and income were grossly overstated.

## MISLEADING FINANCIAL STATEMENTS

54.     In order to overstate its earnings during the Relevant Period, defendants caused Gallagher to violate Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly report and disclose the illegal nature of the Company's receipt of revenues during the Relevant Period.

55.     These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to defendants' improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules. Gallagher manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which

revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated Gallagher's revenue and income.

56. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

57. Due to these accounting improprieties, defendants presented the Company's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

58.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

- 28 -

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59. Plaintiff brings this action derivatively in the right and for the benefit of Gallagher to redress injuries suffered, and to be suffered, by Gallagher as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Gallagher is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

60. Plaintiff will adequately and fairly represent the interests of Gallagher in enforcing and prosecuting its rights.

61. Plaintiff is and was an owner of the stock of Gallagher during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

62. The current Board of Gallagher consists of the following individuals: defendants Robert Gallagher, Patrick Gallagher, Hengesbaugh, Hand, Gordon, Coughlan, Brooker, Wimmer, and Johnson. Plaintiff has not made any demand on Gallagher's present Board to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a) As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors and attendance at management and Board meetings, each of the defendants knew the adverse non public information regarding the misconduct alleged herein and the Company's accounting for it.

- 29 -

(b)     Each executive director directly oversaw the Company's day-to-day operations and was intimately familiar with the Company's practice of entering into contingent commission agreements, steering insurance clients to insurance companies which paid higher contingent commissions and helping them to engage in bid rigging. By virtue of each non-executive defendants' extensive knowledge of the insurance industry, experience serving in a senior financial or executive capacity at a major U.S. company, and/or superior knowledge of the law of insurance and securities, each of the non-executive director defendants possessed the talents and capabilities to recognize the illegality surrounding the contingent commission agreement scheme and had a duty to direct further inquiry to ensure that the Company complied with all of its fiduciary duties and applicable laws. Each failed to do so.

(c)     Under Gallagher's Compensation Committee Charter, the Compensation Committee of the Board determines and approves the compensation of the CEO and makes recommendations to the Board with respect to Gallagher's compensation plans and equity-based plans. The Compensation Committee is comprised of defendants Brooker (Chairman), Gordon, Hand and Wimmer. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Brooker, Gordon, Hand and Wimmer. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Robert Gallagher, Patrick Gallagher, Hengesbaugh, Coughlan and Johnson is futile.

(d)     The principal professional occupation of defendants Robert Gallagher and Patrick Gallagher is their employment with Gallagher, pursuant to which they received and continue to receive substantial monetary compensations and other benefits, as detailed herein at ¶¶21 and 22 respectively. Accordingly, defendants Robert Gallagher and Patrick Gallagher lack independence from defendants Brooker, Gordon, Hand and Wimmer, defendants who are not disinterested and/or

independent and who exert influence over defendants Robert Gallagher's and Patrick Gallagher's compensation by virtue of their positions as members of the Compensation Committee. This lack of independence renders defendants Robert Gallagher and Patrick Gallagher incapable of impartially considering a demand to commence and vigorously prosecute this action.

(e)     According to Gallagher's Proxy Statement filed with the SEC on or about April 5, 2004, non-employee directors on the Board receive director's fees of $30,000 per year, plus $1,000 for each Board or Committee meeting attended. Non-employee directors also receive annual grants of Gallagher common stock options. Accordingly, defendants Hengesbaugh, Coughlan and Johnson lack independence from defendants Robert Gallagher, Patrick Gallagher, Hand, Gordon, Brooker and Wimmer, defendants who are not disinterested and/or independent and who exert influence over defendants Hengesbaugh's, Coughlan's, and Johnson'' compensation by virtue of their positions as CEO and Chairman of the Board and members of the Compensation Committee. This lack of independence renders defendants Hengesbaugh, Coughlan, and Johnson incapable of impartially considering a demand to commence and vigorously prosecute this action.

(f)     According to Gallagher's Proxy Statement filed with the SEC on or about April 5, 2004, defendants Coughlan, Brooker and Wimmer were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for assisting the Board in its oversight of the integrity of Gallagher's financial statements, Gallagher's compliance with legal and regulatory requirements and the performance of Gallagher's internal audit function. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in Gallagher's Annual Report on Form 10-K for the year ended December 31, 2003, as filed with the SEC. By such actions, defendants Coughlan, Brooker and Wimmer breached their duties by causing or allowing the improper financials described above to be included in the 10-K. As a result of these defendants' breach of their duties, any demand upon them is futile;

(g)     The entire Gallagher Board and senior management participated in the wrongs complained of herein.  Gallagher's directors are not disinterested or independent due to the following: defendants Robert Gallagher, Patrick Gallagher, Hengesbaugh, Hand, Gordon, Coughlan, Brooker, Wimmer and Johnson served on the Gallagher Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced defendants breached the fiduciary duties that they owed to Gallagher and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the Gallagher Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Gallagher to millions of dollars in liability for possible violations of applicable securities laws.

(h)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     ***Hengesbaugh, Patrick Gallagher and Robert Gallagher are Long-time Business Associates***:

Defendant Hengesbaugh has served as a senior executive and Chairman of CNA Financial for well over a decade, during which time he caused CNA to conduct significant business with Gallagher.  Despite his plans to retire, Hengesbaugh still has a pension fund investment with CNA and still receives substantial remuneration from CNA in the form of $8 million in severance pay due him by September 2005.  Hengesbaugh also owes CNA over $19 million on a loan he obtained from CNA to purchase significant equity in CNA while he was an executive there.  Hengesbaugh still owns significant equity in CNA for which Gallagher provided over $60,000 in brokerage and other services in 2003 and expects to continue doing considerable business with in the future, which business would be jeopardized if Hengesbaugh

- 32 -

fulfilled his fiduciary duties to Gallagher and recommended the prosecution of the allegations contained herein; and

      (ii)      ***Johnson and Coughlan Are Long Time Business Associates***:

Defendant Johnson has served as president of North American Commercial for Kraft Foods, Inc., since 2003; president of North American Operations, Technology, Procurement, Information Systems and Sales for Kraft Foods North America, Inc., 2002 to 2003; group vice president of Kraft Foods North America, Inc., 2000 to 2002; and executive vice president of Kraft Foods, Inc., 1998 to 2000, having joined Kraft in 1986. Defendant Coughlan served as a senior vice president of Kraft General Foods from 1989 to 1990; prior thereto as senior vice president and chief financial officer of Kraft, Inc. which he joined in 1972. Because of their long-standing and entangling business and professional relationships, neither defendant Johnson nor defendant Coughlan will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

      (i)      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

      (j)      The Director Defendants of Gallagher, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Gallagher's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

      (k)      In order to bring this suit, all of the directors of Gallagher would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

      (l)      The acts complained of constitute violations of the fiduciary duties owed by Gallagher's officers and directors and these acts are incapable of ratification.

      (m)      Each of the Director Defendants of Gallagher authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing

alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

(n)     Any suit by the current directors of Gallagher to remedy these wrongs would likely expose the Individual Defendants and Gallagher to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(o)     Gallagher has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Gallagher any part of the damages Gallagher suffered and will suffer thereby.

(p)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which could subject them to civil and/or criminal liability for violations of securities law, which admissions would impair their defense of any such actions and greatly increase the probability of their personal liability in any such actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they would likely assert in any such actions. This they will not do. Thus, demand is futile.

(q)     If Gallagher's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Gallagher. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability

- 34 -

insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Gallagher against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Gallagher, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.

63. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Gallagher for any of the wrongdoing alleged by plaintiff herein.

64. Plaintiff has not made any demand on shareholders of Gallagher to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Gallagher is a publicly held company with 91 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## AIDING AND ABETTING AND CONCERTED ACTION

65. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

- 35 -

66.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Gallagher and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Gallagher, regarding the Individual Defendants' management of Gallagher's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

67.     The Individual Defendants engaged in a common enterprise and/or common course of conduct commencing by at least July 2003 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact they were causing Gallagher to misrepresent its financial results. In addition, defendants also made other specific, false statements about Gallagher's financial performance and future business prospects, as alleged herein.

68.     The purpose and effect of the Individual Defendants' common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Gallagher common stock so they could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

69.     The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

71.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.     The Individual Defendants owed and owe Gallagher fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe Gallagher the highest obligation of good faith, fair dealing, loyalty and due care.

73.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

74.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

75.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Gallagher has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against All Defendants for Abuse of Control

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Gallagher, for which they are legally responsible.

78.     As a direct and proximate result of the Individual Defendants' abuse of control, Gallagher has sustained significant damages.

79.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### Against All Defendants for Gross Mismanagement

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Gallagher in a manner consistent with the operations of a publicly held corporation.

82.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Gallagher has sustained significant damages in excess of hundreds of millions of dollars.

83.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the misconduct alleged herein, the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Gallagher to waste valuable corporate assets by paying incentive-based bonuses to certain of its executive officers as a result of their misconduct and incur potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

86.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

### Against All Defendants for Unjust Enrichment

87.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Gallagher.

89.     Plaintiff, as a shareholder and representative of Gallagher, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Gallagher has an effective remedy;

C.     Awarding to Gallagher restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED: December 15, 2004

LASKY & RIFKIND, LTD.
LEIGH R. LASKY
NORMAN RIFKIND (6191038)


NORMAN RIFKIND

351 W. Hubbard, Suite 406
Chicago, IL 60610
Telephone: 312/634-0057
Facsimile: 312/634-0059

(Designated Local Counsel)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\BRUF\Gallagher\Complaints\FenerDer Cpt$

## VERIFICATION

I, Brian J. Robbins, hereby declare as follows:

1.     I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 13ᵗʰ day of December, 2004, at San Diego, California

_____
BRIAN J. ROBBINS

Civil Cover Sheet                                                    Page 1 of 2

JUDGE JOHN W DARRAH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

04C 8093

**Civil Cover Sheet**

MAGISTRATE JUDGE ASHMAN

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

DOCKETED
DEC 1 6 2004

**Plaintiff(s): Todd Fener, Derivatively on Behalf of Arthur J. Gallagher & Co.**

**Defendant(s):Robert E. Gallagher, J. Patrick Gallagher, Jr., Bernard L. Hengesbaugh, Elbert O. Hand, Ilene S. Gordon, Gary P. Coughlan, T. Kimball Brooker, James R. Wimmer and David S. Johnson**

County of Residence:

County of Residence: Cook County

Plaintiff's Atty:  Norman Rifkind
                   Lasky & Rikfind, Ltd.
                   351 W. Hubbard, Suite 406,
                   Chicago, IL 60610
                   312-634-0057

Defendant's Atty:

FILED
2004 DEC 15 AM 11:59
U.S. DISTRICT COURT
CLERK

II. Basis of Jurisdiction:       **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
                    Plaintiff:-**2 Citizen of Another State**
                    Defendant:-**1 Citizen of This State**

IV. Origin :                     **1. Original Proceeding**

V. Nature of Suit:               **160 Stockholder Suits**

VI.Cause of Action:              **Derivative action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assests and unjust enrichment, and aiding and abetting.**

VII. Requested in Complaint
          Class Action:**Yes**
          Dollar Demand:
          Jury Demand:**Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

04C 8093 DOCKETED

In the Matter of

Todd Fener, Derivatively on behalf of
Arthur J. Gallagher & Co.
v.
Robert E. Gallgher, J. Patrick Gallgher, et al.

JUDGE JOHN W. DARRAH
MAGISTRATE JUDGE ASHMAN
Case Number:

DEC 16 2004

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff

| (A) | | (B) | |
|---|---|---|---|
| **SIGNATURE** | | **SIGNATURE** | |
| **NAME** Leigh Lasky | | **NAME** Norman Rifkind | |
| **FIRM** Lasky & Rifkind, Ltd. | | **FIRM** Lasky & Rifkind, Ltd. | |
| **STREET ADDRESS** 351 W. Hubbard, Suite 406 | | **STREET ADDRESS** 351 W. Hubbard, Suite 406 | |
| **CITY/STATE/ZIP** Chicago, IL 60610 | | **CITY/STATE/ZIP** Chicago, IL 60610 | |
| **TELEPHONE NUMBER** 312/634-0057 | **FAX NUMBER** 312/634-0059 | **TELEPHONE NUMBER** 312/634-0057 | **FAX NUMBER** 312/634-0059 |
| **E-MAIL ADDRESS** lasky@laskyrifkind.com | | **E-MAIL ADDRESS** rifkind@laskyrifkind.com | |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6189404 | | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6191038 | |
| **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ | | **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ | |
| **TRIAL ATTORNEY?** YES ☑ NO ☐ | | **TRIAL ATTORNEY?** YES ☑ NO ☐ | |
| | | **DESIGNATED AS LOCAL COUNSEL?** YES ☑ NO ☐ | |
| (C) | | (D) | |
| **SIGNATURE** | | **SIGNATURE** | |
| **NAME** Amelia S. Newton | | **NAME** Brian Robbins | |
| **FIRM** Lasky & Rifkind, Ltd. | | **FIRM** Robbins, Umeda & Fink LLP | |
| **STREET ADDRESS** 351 W. Hubbard, Suite 406 | | **STREET ADDRESS** 610 West Ash Street, Suite 1800 | |
| **CITY/STATE/ZIP** Chicago, IL 60610 | | **CITY/STATE/ZIP** San Diego, CA 92101 | |
| **TELEPHONE NUMBER** 312/634-0057 | **FAX NUMBER** 312/634-0059 | **TELEPHONE NUMBER** 619/525-3990 | **FAX NUMBER** 619/525-3991 |
| **E-MAIL ADDRESS** newton@laskyrifkind.com | | **E-MAIL ADDRESS** robbins@ruflaw.com | |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6190594 | | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** | |
| **MEMBER OF TRIAL BAR?** YES ☐ NO ☑ | | **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ | |
| **TRIAL ATTORNEY?** YES ☐ NO ☑ | | **TRIAL ATTORNEY?** YES ☐ NO ☐ | |
| **DESIGNATED AS LOCAL COUNSEL?** YES ☑ NO ☐ | | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ | |

1-3